**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| PAMELA S QUICK, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL NO. 2:16-CV-109 |
| | § | |
| WAL-MART STORES, INC.; dba | § | |
| WALMART, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

BE IT REMEMBERED that on June 2, 2017 the Court considered Defendant Wal-mart Stores, Inc.′s ("Walmart") Motion for Summary Judgment (D.E. 20) and all responses to the motion. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Walmart′s Motion for Summary Judgment. The Court **GRANTS** Walmart′s Motion for Summary Judgment on all FMLA claims and claims of sex discrimination. The Court **DENIES** Walmart′s Motion for Summary Judgment on Quick′s age discrimination claim.

The Court declines to rule on Walmart′s Motion for Summary Judgment on Quick′s disability discrimination claims, and **ORDERS** supplemental briefing with relevant summary judgment evidence consistent with the opinion below.

## I.      Statement of Undisputed Facts

Pamela S. Quick ("Quick") began her employment with a Walmart store in Portland, Texas on November 13, 2013 as a meat market associate. Quick Dep., D.E. 20 Ex. A at 23:19-23. Quick was sixty-four years-old at the time. *Id.* at 111:17-20. Quick alleges that on March 14, 2014 she slipped on some ice in the freezer. *Id.* at 33:8-24. Dr. Dustin O'Hern ("O'Hern") released Quick to return to work on March 15, 2014 with the restriction that she not lift more than ten pounds. *Id.* at 38:5-13,

40:10-41:16; Dkt. No. 20 Ex. A(3).[1] On March 25, 2014, Quick then saw Walmart's plan doctor, Dr. Mobley ("Mobley"). Quick Dep., D.E. 20 Ex. A at 39:10–40:9, ex. 2. Mobley placed her on light duty with a twenty-pound lifting restriction. *Id.* at 41:17-25. When she returned to work, Quick was given a Temporary Alternative Duty Assignment. Quick Dep., D.E. 20 at 43:1-20; Dkt. No. 20 Ex. 4 (titled "Temporary Alternative Duty Assignment" and stating that "Dr. Mobley has released you to return to work with the following restrictions: May not lift/carry objects more than 20 lbs."). The Temporary Alternative Duty Assignment provided, "We have a temporary position available for you that will accommodate the restrictions under which the physician has authorized you to return to work. The position being offered to you will include (but is not limited to) the following duties: Normal job duties in the Meat Market but with the restrictions of not lifting or carrying more than 20 lbs." Dkt. No. 20 Ex A(4). Quick continued to work with these restrictions until June 18, 2014, when she was released by Dr. Donna McMann ("McMann") to return to work to her full duties through a Physician's Status Report with Walmart letterhead. *See* Dkt. No. 20 Ex A(5) (stating that Quick "[m]ay return to work with no restrictions on date 6/18/14"); *see also* Quick Dep., D.E. 20 at 52:24–53:8 (stating that McMann is an associate of Mobley).

At various points in 2014, Quick asked for transfers that would have allowed her to be placed in lighter-duty stations. *See* Quick Dep., Dkt. No. 21 Ex. A at 145:22–25 (testifying that after her injury, Quick requested a transfer to another department ten times, though not specifying in what timeframe). Walmart does not appear to dispute this testimony of Quick that she asked for transfers to other departments, although personnel coordinator Karen Neimeier ("Neimeier") states in her declaration that after she instructed Quick "that she should abide by her

---

[1] O'Hern's Work Release dated March 15, 2014 stated that he saw Quick at the Corpus Christi Medical Center–Northshore on that date. The Work Release provides a restriction of "no heavy lifting [greater than] 10 lbs if still having back pain, otherwise no restrictions." Dkt. No. 20 Ex. A(3). Quick testified in deposition that she did not understand why the exhibit states the date of March 15, 2014 because she went to Northshore urgent care on the date of the accident, which she testifies was on March 14, 2014. Quick Dep. D.E. 20 Ex. A at 40:18-25. It is reasonable to infer that the March 15, 2014 date was a scrivener's error.

[twenty-pound] restrictions," "[Quick] never complained [to her] that she was asked to work outside of her restrictions." Neimeier Dec., Dkt. No. 20 Ex. B at ¶ 4.

Antonio Lopez ("Lopez"), a meat market associate, testified that based on his experience, the size of a box located in the meat market department "weigh[ed] about fifty pounds, almost to a range of seventy-five pounds of meat." Lopez Dep., Dkt. No. 21 Ex. B at 12:3-12. He also testified that at least ninety percent of all the boxes that an associate working in the meat department would be lifting on a given day exceeded forty pounds. *Id.* at 12:13-17. Lopez also testified through his deposition that he expressed a complaint to the area manager, Mary Moreno ("Moreno"), and the store manager, Luis Leija ("Leija"), on behalf of Quick. *Id.* at 12:18–13:22 ("The reason why is because I would see her suffer. Sometimes I would see her cry. I would see her in pain and I would see basically a meat market manager that wasn't taking any precaution or any . . . type of care with Pam [Quick] . . . .").

Lopez testified that he tried to get Quick transferred to his department, the produce department, "because [it] didn't have any type of certain limitations on the weight as -- as what meat market did." *Id.* at 14:22-25. Lopez did not testify as to the timeframe of these efforts, though stated that he had these conversations with Leija "numerous times" prior to his departure from Walmart in September 2014 and that some of the conversations took place between March 25, 2014 and June 18, 2014. *Id.* at 17:13-23. He also testified that between March 25, 2014 and June 18, 2014, he did not see or observe Quick being assigned to light duty, and that there was light duty work available at the Walmart store. *Id.* at 16:2-17. He also testified that during the time period of March 25, 2014 to June 18, 2014, he saw "a couple of associates that were hurt from different departments working light duty, such as shredding paper, getting receipts ready for site to store, helping out." *Id.* at 16:19–17:2.

Lopez had hiring responsibilities at Walmart, and testified that Leija "pulled me over to the side and told me that I would basically have to start hiring younger people . . . because they're a lot faster, quicker [and] don't have to deal with any

type of missed days or doctor's – doctor appointments or whatnot." *Id.* at 19:18-24; 20:11-14. When asked in deposition if he received any explanation by Moreno or Leija about why Quick was not given light duty, Lopez testified that "they were telling me that we didn't have enough people there in the store" and that employees "hired in [the] meat market are just going to have to deal with it." *Id.* at 20:19-22.

On December 4, 2014, Quick complained to Neimeier that her back was hurting. Neimeier Dec., Dkt. No. 20 Ex. B, ¶ 6. Although Quick denies that she said that the back pain was caused by something other than her on-the-job injury, *see* Quick Affidavit, Dkt. No. 21 Ex. C, ¶ 12, Neimeier declares that because her understanding from Quick was that this pain was due to a pre-existing condition, she notified Quick of her rights under the FMLA. *See* Neimeier Dec., D.E. 20 Ex. B, ¶ 6. Quick requested FMLA leave for December 4 to 7, 2014. Dkt. No. 20 Ex. A(10).

Walmart outsources its FMLA certification and processing to its third party contractor, Sedgwick Claims Management Systems, Inc. ("Sedgwick."). Sedgwick began the FMLA process after Quick notified Neimeier that her back was hurting. Dkt. No. 20 Ex. A(9). The Sedgwick letter to Quick dated December 5, 2014 stated:

> On December 05, 2014, Sedgwick became aware of your need to take leave beginning on December 4, 2014 with an estimated end date of December 7, 2014 due [to] a serious health condition that makes you unable to perform the essential functions of your job.
>
> We are pleased to inform you that you conditionally meet the FMLA's basic eligibility requirements of working 12 months and 1250 hours in the 12 months prior to the start date of your leave. On the first date of absence, a final eligibility review will be made to determine if you continue to meet the eligibility requirements.

Sedgwick Letter of Dec. 5, 2014, Dkt. No. 20, Ex. A(9) at 1. The letter further informs Quick to, *inter alia*, return the certification form no later than December 25, 2014; return the completed Medical Authorization for Release of Information form as soon as possible if there is need for Sedgwick to contact her health care provider; and to notify Sedgwick if there is a change in her leave end date. *Id.*

The letter also states:

In order for us to determine whether your absence qualifies for leave, you must provide us a complete and sufficient certification to support your leave request no later than December 25, 2014. A certification of health care provider form is enclosed. If required information is not provided by the date indicated above, your leave may be denied. Please contact your leave specialist with any questions or concerns.

*Id.* at 1–2.

The evidence shows another letter addressed to Quick dated December 26, 2014 in which Sedgwick states:

On December 05, 2014, Sedgwick became aware of your need to take leave beginning on December 04, 2014 with an estimated end date of December 07, 2014 due [to] a serious health condition that makes you unable to perform the essential functions of your job.
There are two items that need to occur before a final leave decision can be made:

- You must meet the eligibility requirements (hours and length of service)
- Provide medical documentation to support your leave request

Sedgwick Letter of Dec. 26, 2014, Dkt. No. 20 Ex. A(10) at 1. The letter indicates that among the required actions is to "[r]eturn the certification form no later than January 15, 2015;" "[r]eturn the completed Medical Authorization for Release of Information form;" and "[n]otify Sedgwick if there is a change in your leave end date." *Id.*

Quick testified through her affidavit, "Karen [Neimeier] and Kayla, Area Manager, advised me that I would not be allowed to return to the meat market until I was 100% released for work." Quick Affidavit, Dkt. No. 21 Ex. C, ¶ 8. In her briefing, Quick argues that a new limitation was imposed by Mobley on December 30, 2014, and in support she attaches physician notes that indicate that Quick "may return to work" and "no lifting [greater than] 10 [pounds] 34/wk." Dkt. No. 21 at 6; Dkt. No. 21 Ex. J.

Quick remained on leave until January 29, 2015. Neimeier Dec., Dkt. No. 20 Ex. B, ¶ 8. An email dated January 8, 2015 from Neimeier to Shawn Laski, an employee of Equifax who was handling Quick's unemployment claim against

Walmart, stated, "This Associate is currently on a Leave of Absence at our store. She is trying to come back but she has a lifting restriction and that is not going to work in the area that she works. She is on [Leave of Absence] until she can return without restrictions." Dkt. No. 21 Ex. K.

At some point in 2014, a younger male employee, Chris Verange ("Verange"), was given light duty when he broke his finger. Quick Dep., Dkt. No. 21 Ex. A, 115:1-18 ("He was given shredding paper. He was given pushing the wax mop, and he was given answering the phones in the fitting room."); Neimeier Dec., D.E. 20 Ex. B, ¶ 11 ("[Verange] had a broken bone in his hand which was in a cast. Because he was not able to use his hand, he was unable to work in the meat market in any capacity, and we gave him various light duty assignments, such as shredding paper, until he was released to use his hand again . . . . We base light duty assignments based on the information we received from the associate and their doctor about work limitations in light of their medical conditions."). Quick recalls another younger male employee was given light duty assignment when he hurt his foot. Quick Dep., Dkt. No. 20 Ex. A, 116:20–15.

Quick's FMLA leave request was denied on January 29, 2015. Dkt. No. 20, Ex. B(4). Quick did not provide any documentation to Walmart stating that she could not return to work as of February 11, 2015. *See* Quick Dep. 102:8–25.[2] When

---

[2] Quick testified as follows:

Q. And this document states that you may return to work on 2/11/2015, correct?

A. Correct.

Q. Do you know if Wal-Mart ever received any work restriction – any return to work documents from anybody, any other doctor?

A. No.

Q. Or Dr. Borkowski after February 11th, 2015?

A. I went in and I had a – what you call it? I had an appointment. And I had, you know, verification that I had an appointment for Dr. Borkowski for the next week, okay, to show that I wasn't released. And they said well, we've got this and you're fired.

Q. Well, you can be released to work to return and still have an appointment with the doctor, right? Is that a yes?

A. Yes.

Q. Okay. So did you ever provide anything to Wal-Mart after February 11th, 2015 that said that you could not return to work as of February 11th, 2015?

A. No.

Quick Dep., Dkt. No. 20 Ex. A at 102:8–25

her FMLA leave was denied, Neimeier called Quick and told her that her FMLA leave request had been denied and that she needed to return to work. Neimeier Dec., Dkt. No. 20 Ex. B ¶ 8–9. Sometime after the phone call, Neimeier received a Work Excuse from Dr. John M. Borkowski ("Borkowski"). *Id.* at ¶ 9. The Work Excuse, signed February 6, 2015, stated that Quick could return to work on February 11, 2015. Dkt. No. 20, Ex. B(5). At some point after February 6, 2015, Quick came to the store and met with Neimeier and Leija. Neimeier and Leija advised Quick that because her FMLA leave request had been denied and because her doctor had released her to return to work, she would need to return to work at that time. Neimeier Dec., Dkt. No. 20, Ex. B ¶ 10. Quick stated that she was physically unable to return to work. On or about February 15, 2015, Quick was terminated. On March 23, 2015, Borkowski sent the FMLA certification form. Dkt. No. 21 at 6; Dkt. No. 21 Ex. G.

During the course of her employment with Walmart, Quick testified that she was subjected to comments by the manager of the meat market, such as, "You're a woman, what do you expect." Dkt. No. 21 at 19; Dkt. No. 21, Ex. A at 121:7–122:25. Quick testifies that the store manager referred to Quick as a "housewife" and would tell her, "Here are the dishes" and "You can do the dishes; you're used to that." *Id.*

Quick brings FMLA interference and retaliation claims. *See* First Am. Pet. (Dkt. No. 1-1 beginning at 14 of 21) ¶ 9. She also brings age, sex, and disability discrimination claims under the Texas Labor Code. *Id.* at ¶ 8, 11. Though Quick initially brought negligence claims against Walmart,[3] this Court granted Walmart's unopposed motion to sever, abate, and compel the negligence claims to arbitration. *See* Def.'s Unopposed Mot. to Sever, Abate, and Compel Arbitration, Dkt. No. 8 at 3–4 (stating that Walmart's Texas Injury Care Benefit Plan provides in Appendix A, Arbitration of Certain Injury Related Disputes, "that the binding arbitration will be

---

[3] Quick alleged that Walmart breached its duty to provide employees a safe place to work by failing to maintain the floor in and around the small freezer, failing to equip the area in and around the small freezer with a long-handled ice chipper, failing to properly train the employees at Walmart on how to maintain the floor and remove ice in and around the small freezer, and failing to warn employees of the risk associated with the accumulation of ice on the floor in and around the small freezer. First Am. Pet. ¶ 10.

the sole and exclusive remedy for resolving work-related injury claims or disputes" and that Quick completed the Texas Injury Care Benefit Plan module on October 17, 2012); *see generally* Order, Dkt. No. 12.

Quick seeks compensatory, economic, personal injury, punitive damages, and attorney's fees. First Am. Pet. ¶ 11.

## II.    Summary Judgment Standard

"[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Piazza's Seafood World, L.L.C. v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and mandates the entry of summary judgment for the moving party." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)) (internal quotation marks omitted).

The Court must view all evidence in the light most favorable to the non-moving party. *Piazza's Seafood World*, 448 F.3d at 752. Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "When assessing whether a dispute to any material fact exists, [courts] consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

"Once the moving party has initially shown 'that there is an absence of evidence to support the non-moving party's cause,' the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *TIG Ins. Co.*

*v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Celotex*, 477 U.S. at 325). The non-movant may not merely rely on conclusory allegations or the pleadings. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). The non-movant's burden is not satisfied by "conclusory allegations," "unsubstantiated assertions," or "by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotations and citations omitted). Courts are not required to search the record on the non-movant's behalf for evidence that may raise a fact issue. *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988).

### III.    Family and Medical Leave Act Claims

The FMLA was enacted to allow eligible employees "to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2) (2016). Under the FMLA, eligible employees are entitled up to twelve work weeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Id.* § 2612(a)(1)(D). When an employee returns from leave "[t]he employer must thereafter restore the employee to the same position as previously held or a comparable position with equivalent pay, benefits, and working conditions." *Smith v. East Baton Rouge Parish School Bd.*, 453 F.3d 650, 651 (5th Cir. 2006) (citing 29 U.S.C. § 2614(a)(1)).

The FMLA prohibits interference with FMLA rights and retaliation against an individual for opposing any practice made unlawful by the chapter. *See* 29 U.S.C. § 2615(a) (2016). The Fifth Circuit elaborated on this distinction in *Nero v. Industrial Molding Corp.*:

> We have explained that the FMLA contains two distinct provisions. The first type of provision creates a series of entitlements or substantive rights. An employee's right to return to the same position after a qualified absence falls under this category. An employer must honor entitlements, and cannot defend by arguing that it treated all employees identically. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are

satisfied, regardless of the intent of the employer. The second type of provision is proscriptive, and protects employees from retaliation or discrimination for exercising their rights under the FMLA.

167 F.3d 921, 927 (5th Cir. 1999) (internal citations and quotes omitted).

FMLA "claims that arise from the deprivation of an FMLA entitlement do not require a showing of discriminatory intent, whereas claims that arise from alleged retaliation for an employee's exercise of FMLA rights do." *Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342, 349–50 (5th Cir. 2013) (Elrod, J., specially concurring) (comparing *Nero*, *supra*, with *Chaffin v. John H. Carter Co., Inc.*, 179 F.3d 316, 319 (5th Cir. 1999)); *see also Spears v. La. Dept. of Pub. Safety and Corr.*, F. Supp. 3d 873, 878 (M.D. La. 2014) (analyzing interference claim as retaliation claim based on substance of claim).

A.    FMLA Interference

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" these rights. 29 U.S.C. § 2615(a)(1). This provision "creates a series of entitlements or substantive rights." *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 580 (5th Cir. 2006). To succeed on an interference claim under § 2615(a)(1), Quick "must at least show that [her employer] interfered with, restrained, or denied her exercise or attempt to exercise FMLA rights, and that the violation prejudiced her." *Cuellar*, 731 F.3d at 347 (per curiam panel opinion) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)); *see also Bell v. Dallas Cnty.*, 432 F. App'x. 330, 334 (5th Cir. 2011) (per curiam, unpublished) (citing *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 885 (7th Cir. 2005)). Interference under § 2615(a)(1) includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b) (2010); *Bell*, 432 F. App'x. at 334; *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050–51 (8th Cir. 2006). Walmart disputes the allegation that it

interfered with, restrained, or denied Quick's exercise or attempt to exercise FMLA rights.

To establish a *prima facie* interference case, a plaintiff must show that (1) she was an eligible employee, (2) the defendant was an employer subject to the FMLA's requirements, (3) she was entitled to leave, (4) she gave proper notice of her intention to take FMLA leave, and (5) the defendant denied her the benefits to which she was entitled under the FMLA. *Lanier v. Univ. of Texas Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013) (unpublished) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012)); *Jones v. Children's Hosp.*, 58 F. Supp. 3d 656, 668 (E.D. La. 2014). The parties agree that Quick and Walmart fall within the statutory definition of eligible employee and employer, respectively. *See* Dkt. No. 20 at 13; Dkt. No. 21 at 25. However, Walmart argues that Quick does not meet prongs three and five because Quick was not entitled to leave and therefore Walmart did not deny her the benefits to which she was entitled.

In *Mauder*, the employer asked the plaintiff to provide medical certification that he had a qualifying serious health condition under the FMLA. 446 F.3d at 581–82; *see also* 29 C.F.R. § 825.305(a) (2010) ("An employer must give notice of a requirement for certification each time a certification is required."). The employee replied in an email message to his supervisor; the employee stated that the employer had all of the documentation it needed and refused to provide more. *Mauder*, 446 F.3d at 582. The Fifth Circuit concluded that the employee's "failure to provide his employer with requested information to effectuate the leave he asked for in the first place is a sufficient reason for us to hold that the district court did not err in granting summary judgment in favor of [the employer] on this issue. *Id.* at 582–83. It reasoned that "[i]n addition to allowing leave for ill employees, the FMLA also protects the employer by providing that '[a]n employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee." *Id.* at 582 (quoting 29 U.S.C. § 2613(a)). As the Fifth Circuit explained, the FMLA is "a statute that requires cooperation from the

employer *and* employee. After all, the ultimate underlying purpose of the FMLA is to accommodate a particular medical circumstance." *Id.* (emphasis in original).

Even though Quick had requested FMLA leave from December 4 to December 7, Quick did not return to work for the remainder of December 2014 or January 2015, instead taking a leave of absence. *See* Neimeier Dep., Dkt. No. 20 Ex. B at ¶ 8 ("On or about the end of January or the beginning of February, I was advised that Ms. Quick's FMLA leave had been denied. Even though Ms. Quick had requested FMLA leave from December 4 to December 7, Ms. Quick had not returned to work since December 4, 2014."); Dkt. No. 21 Ex. K. Borkowski also released Quick to return to work effective February 11, 2015, and following this release, Quick provided no other paperwork indicating that she was requesting additional leave. *See* Dkt. No. 20 Ex. A(12). Furthermore, Walmart only requested Quick to return to work after learning that Sedgwick had denied her FMLA request. Additionally, though Borkowski sent the FMLA certification form on March 23, 2015, *see* Dkt. No. 21 at 6; Dkt. No. 21 Ex. G, the Sedgwick letter dated December 26, 2014 indicated that the second deadline for submitting certification was January 15, 2015. *See* Dkt. No. 20 Ex. A(10) at 1.

Regardless of Quick's subjective belief and argument that Walmart should have allowed her to provide more time to submit certification[4] documentation, *see generally* Dkt. No. 21, Walmart had a right to require that documentation under the FMLA. *See* 29 U.S.C. § 2613(a) (2016) ("An employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee . . . . The employee shall provide, in a timely manner, a copy of such certification to the employer."); *Mauder*, 446 F.3d at 582 (explaining that requesting documentation was "well within Metro's rights under the FMLA as an employer").

---

[4] "Certification . . . shall be sufficient" if it states "the date on which the serious health condition commenced"; "the probable duration of the condition"; "the appropriate medical facts within the knowledge of the health care provider regarding the condition"; and "for purposes of leave under section 2612(a)(1)(D) of this title, a statement that the employee is unable to perform the functions of the position of the employee." 29 U.S.C. § 2613(b) (2016).

Furthermore, as discussed *supra*, Walmart provided two letters to Quick—one with a December 25, 2014 deadline and, when Quick did not submit the requisite documentation by that time, another with a January 15, 2015 deadline. *See* Dkt. No. 20 Ex. A(9); Dkt. No. 20 Ex. A(10). Despite this evidence, Quick's response brief analogizes her case to that of *Silva v. City of Hidalgo, Texas*, 575 F. App'x. 419 (5th Cir. 2014) (unpublished), where the Fifth Circuit noted that an employer's "unbudging framework" of terminating employees if they were unable to return to work following the expiration of FMLA leave could violate the employer's ADA duties. *Id.* at 423. In *Silva v. City of Hidalgo*, the Fifth Circuit upheld the district court's granting of the defendant's motion for summary judgment regarding the Plaintiff's ADA claim. 575 F. App'x. at 423. The Court stated in dicta that the defendant's practice of allowing an employee to take FMLA leave and "then terminat[ing] her if she was unable to return to her former position when her leave expired" was an "unbudging framework." *Id.* Nevertheless, the Court held that employer's "unbudging framework" did not violate defendant's duty under the ADA because the doctor's assessment stated that Silva required extensive physical therapy for at least one to two more months and "[r]easonable accommodation does not require an employer to wait indefinitely for the employee's medical conditions to be corrected." *Id.* at 423–24 (quoting *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 760 (5th Cir. 1996)). Setting aside the fact that the above language in *Silva v. City of Hidalgo* was written in the context of an ADA claim and not an FMLA interference claim, there is no evidence from which to infer that Walmart operated in an "unbudging framework." Walmart gave Quick two opportunities to submit paperwork, and then contacted her to inform her that her FMLA had been denied, and that she would be expected to come to work.

Because the evidence is undisputed that Quick did not provide medical certification despite having the opportunity to do so and that Walmart had a right to require that documentation under the FMLA, the Court concludes that no reasonable jury could return a verdict for Quick on her FMLA interference claim.

Walmart is thus entitled to summary judgment on Quick's FMLA interference claim.

B.  FMLA Retaliation

Quick brings forward an FMLA retaliation claim. *See* First Am. Pet. ¶ 9. Quick's complaint states that Walmart's "conduct amounts to interference with Quick's FMLA rights and retaliation for taking advantage of FMLA benefits." *Id.*

To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show that "(1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave." *Hunt v. Rapides Healthcare Sys.*, 227 F.3d 757, 768 (5th Cir. 1999); *Cuellar v. Perma-Temp Pers. Servs., Inc.*, No. CV 1-10-191, 2011 WL 13127948, at *9 (S.D. Tex. Dec. 9, 2011), *aff'd*, *Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342 (5th Cir. 2013). If a plaintiff carries his initial burden, the burden shifts to the defendant "to articulate a legitimate nondiscriminatory or nonretaliatory reason for the employment action." *Hunt*, 277 F.3d at 768 (citing *Chaffin*, 179 F.3d at 319). If the employer articulates such a reason, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the employer's reason "is a pretext for retaliation." *Id.* (citing *Chaffin*, 179 F.3d at 320).

In her briefings, Quick does not provide any factual allegations to support her FMLA retaliation claim. *See generally* Dkt. No. 21 at 6. As such, Quick has not stated a claim upon which relief may be granted.[5] *See* Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the

---

[5] The Court notes that Walmart did not file a motion to dismiss and, therefore, the Court evaluates this FMLA retaliation cause of action at the summary judgment phase of litigation.

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Because Quick has not alleged sufficient facts, much less put forward evidence, to overcome Walmart's motion for summary judgment on the FMLA retaliation claim, the Court finds that dismissal of this cause of action is appropriate.

## IV.    Disability Claims

Quick alleges that Quick's "request for a reasonable accommodation was never granted nor implemented." First Am. Pet. ¶ 7. Quick also brings forward a discrimination claim under Chapter 21 of the Texas Labor Code (the Texas Commission on Human Rights Act or "TCHRA"). *See* First Am. Pet. ¶ 8; Dkt. No. 21 at 8.

The Texas Labor Code provides:

> An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

Tex. Lab. Code § 21.051.

Notably, the prohibition of employers from discriminating against or discharging an employee because of the employee's disability "applies only to discrimination because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job." Tex. Lab. Code § 21.105. Employers also violate the TCHRA if they "fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability . . . unless the [employer]

demonstrates that the accommodation would impose an undue hardship on the operation of the business." *Id.* § 21.128(a).

A.    Reasonable Accommodation

Quick alleges that Walmart failed to provide reasonable accommodation in contravention of Chapter 21 of the Texas Labor Code. Quick testified through her deposition that at the time around her March 2014 injury, Walmart had other duties available, including shredding papers, mopping the floor, putting toilet paper in, meeting and greeting people, sitting and answering the phone, and working in the changing room. Quick Dep., Dkt. No. 21 Ex. A at 139:21–140:19. She also testified that she proposed the position of working in the dressing room to Neimeier, and that Neimeier stated that Walmart did not have an opening. Quick Dep., Dkt. No. 20 Ex. A, 85:15–86:19. Neimeier also declares that at the time that Quick's employment ended, Walmart "did not have the greeter position at the store." Neimeier Dec., Dkt. No. 20 Ex. B, ¶ 12. Therefore, a genuine dispute of material fact exists as to whether Walmart had other positions available at the time that Quick asked to transfer to other duties. *See* Dkt. No. 21 at 15; Quick Dep., Dkt. No. 21 Ex. A at 139:21–140:19, 145:22–25.

Additionally, Quick argues that Walmart did not abide by the Temporary Alternative Duty Assignment limiting her lifting to twenty pounds because Walmart continued to require Quick "to lift boxes that exceeded the weight restriction and climb ladders to properly shelve product that exceeded the weight restriction in the Meat Market." Dkt. No. 21 at 5. Quick attaches summary judgment evidence showing that meat market associates were often asked to life more than forty pounds. *See* Lopez Dep., Dkt. No. 21 Ex. B, 12:13-17.

"The TCHRA, like the ADA, prohibits employment-based discrimination grounded in an individual's disability. Given the similarity between the ADA and the TCHRA, Texas courts 'look to analogous federal precedent for guidance when interpreting the Texas Act.'" *Rodriguez v. ConAgra Grocery Prod. Co.*, 436 F.3d 468, 473 (5th Cir. 2006) (quoting *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex.

1999)) (other citations omitted); *see also Herrera v. CTS Corp.*, 183 F. Supp. 2d 921, 925 (S.D. Tex. 2002) ("The [TCHRA] purports to correlate state law with federal law in the area of discrimination in employment. Federal law prohibiting disability discrimination by employers is found in the . . . [ADA], and thus courts must look to this statute in interpreting the TCHRA.") (citations and quotations omitted). Therefore, though Quick's claim is brought under the TCHRA, the Court's analysis of Quick's claim is conducted by examining federal precedent interpreting the ADA.

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a) (2016). Discrimination includes failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship." *Id.* § 12112(b)(5)(A); *see also Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013). Thus, a plaintiff must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a "qualified individual with a disability;" (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make "reasonable accommodations" for such known limitations. *Feist*, 730 F.3d at 452 (footnote omitted).

Here, the parties dispute whether Quick was a qualified individual with a disability and whether Walmart failed to make reasonable accommodations. The threshold requirement in any case brought under the ADA is a showing that the plaintiff suffers from a disability protected under the Act. *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011) (citing *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 654 (5th Cir. 2003); *Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.*, 242 F.3d 610, 613 (5th Cir. 2001); *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998); *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1119 (5th Cir. 1998); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996). A disability is "[a] physical or mental impairment that substantially limits one or

more of the major life activities of such individual." *Griffin*, 661 F.3d at 222 (quoting 29 C.F.R. § 1630.2(g)).

Courts are to make an individualized determination of whether an employee's impairment constitutes a disability. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999). Accordingly, the ADA requires a case-by-case determination of the nature of the employee's impairment. *Griffin*, 661 F.3d at 222. "An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." *Id.* (quoting *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 199 (2002)).

To be considered a disability, an injury or impairment "must substantially limit a major life activity." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995). Put another way, "neither the Supreme Court nor [the Fifth Circuit] has recognized the concept of a per se disability under the ADA, no matter how serious the impairment; the plaintiff still must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies." *Waldrip*, 325 F.3d at 656. Thus, to defeat summary judgment, Quick must create a fact issue showing that he "(1) [has] a mental or physical impairment that (2) substantially limits (3) a major life activity." *Dupre*, 242 F.3d at 613; *see also Pedroza v. Autozone, Inc.*, 536 F. Supp. 2d 679, 690 (W.D. Tex. 2008).

Quick argues that she was not accommodated by Walmart when she returned to work with a twenty-pound lifting restriction after her March 2014 on-the-job injury. Walmart argues that that the twenty-pound lifting restriction does not mean that Quick had a disability. *See* Dkt. No. 20 at 6.

Quick analogizes the facts of her case to those of *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984 (W.D. Tex. 2012). *See* Dkt. No. 21 at 16. In *Molina*, a medical assistant formerly employed by a Texas dialysis clinic filed a state court action under the TCHRA, claiming that her former employer failed to provide her with reasonable accommodations when it prohibited her from working with medical restrictions and denied her additional medical leave. In that case, the plaintiff suffered from back pain, head pain, and tingling in her legs. *Molina*, 840 F. Supp.

2d at 988. Molina's doctor issued medical restrictions limiting her work hours and also restricting her from lifting over twenty pounds. *Id.* at 989. Later, the plaintiff suffered a back injury and was restricted to working every other day and not lifting over ten pounds. *Id.* On both occasions, the defendant accommodated the plaintiff's restrictions and allowed her to continue working. *Id.* The plaintiff later had surgery on her kidneys and her back condition worsened. Eventually, higher-level management learned that the plaintiff was allowed to work with medical restrictions and told her that she would be placed on FMLA leave until she could return to work without her lifting restrictions. *Id.* at 990. When the plaintiff's FMLA leave expired and she was not eligible for any other leave, her employment was terminated. *Id.* The Court in *Molina* found that her previous history did not foreclose an argument that she was disabled. ("Molina testified that she 'learned to tolerate the pain' to be able to continue working even on days when the pain was severe. When testifying that she continued to do her household tasks such as cooking, cleaning and taking care of her disabled husband, Molina explained: 'I had to do everything because I'm by myself.' "). *Id.* at 994.

The Fifth Circuit has held that lifting and reaching constitute major life activities. *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725 n.7 (5th Cir. 1995) (citing 29 C.F.R. § 1630, Appendix to Part 1630—Interpretive Guidance on Title I of the Americans with Disabilities Act, § 1630.2(1)). Therefore, when a plaintiff claims substantial limitation of his ability to reach and lift, the reviewing court must examine how the plaintiff can perform these functions in the context of the normal activities of daily living. *Pedroza*, 536 F. Supp. 2d at 692 (citing *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir. 1998) (citations omitted)). While Quick's work release conditions from March 2014 may support her contention that she was faced with a substantial limitation, her briefing does not explain how she performs lifting functions in the context of normal activities of daily living. *Cf. Pedroza*, 536 F. Supp. 2d at 692 ("To provide an analytical backdrop, Pedroza states that he is not able to lift his daughter.").

In *Pryor v. Trane Co.*, 138 F.3d 1024 (5th Cir. 1998), the Fifth Circuit found that a plaintiff's substandard ability to lift from shoulder to overhead did not constitute a substantial limitation of a major life activity. *Id.* at 1027. In *Dutcher*, the plaintiff presented evidence that she could "do lifting and reaching as long as she avoid[ed] heavy lifting and repetitive rotational movements," *Dutcher*, 53 F.3d at 726, and testified that she "[had] trouble picking up little things from the floor" and "holding things up high or real tight for long periods of time." *Id.* at 726 n.11. After analyzing this evidence, the Fifth Circuit held that as a matter of law, "a jury could not find that her impairment substantially limits life activities on this basis." *Id.*

In *Ray v. Glidden*, 85 F.3d 227 (5th Cir. 1996), the Fifth Circuit held that an ADA plaintiff was not substantially limited in a major life activity even though he could not lift heavy objects and his physician had recommended that he be limited to lifting objects weighing from five to ten pounds. *Id.* at 229. The Court reasoned that "[t]o determine whether a person is substantially limited in a major life activity other than working, we look to whether that person can perform the normal activities of daily living." *Id.* (citations omitted). The Court found that the plaintiff was not substantially limited because he "c[ould] lift and reach as long as he avoid[ed] heavy lifting." *Id.* Several unpublished Fifth Circuit cases reinforce this holding. *See, e.g.*, *Shannon v. Henderson*, No. 01-10346, 2001 WL 1223633, at *8 (5th Cir. Sept. 25, 2001) (unpublished) (holding that a plaintiff who could not lift items over twenty pounds was not substantially limited); *Moody v. M.W. Kellogg Co.*, No. 98-20757, 1999 WL 153032, at *3 (5th Cir. Mar. 8, 1999) (unpublished) (holding that a plaintiff who could not lift objects over ten pounds was not substantially limited).

Quick premises her lifting disability on being restricted to lifting no more than ten pounds, then twenty pounds, and then, again, ten pounds. Dkt. No. 21 at 14. However, the Court has no "analytical backdrop," *see Pedroza*, 536 F. Supp. 2d at 692, through which to make a decision as to whether Quick was substantially limited in a major life activity when she could not lift heavy objects. *Cf. Ray*, 85

F.3d at 229. In light of the fact that courts are "to make an individualized determination of whether an employee's impairment constitutes a disability," *see Sutton*, 527 U.S. at 483, the Court finds that supplemental briefing and summary judgment evidence is appropriate on whether Quick was disabled within the meaning of TCHRA.

B.    Disability Discrimination

The Fifth Circuit analyzes discrimination claims brought pursuant to the ADA using the *McDonnell Douglas* framework. *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000); *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir. 1995). Utilizing the *McDonnell Douglas* analysis, a plaintiff must first make a prima facie showing of discrimination by establishing that: (1) he is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees. *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 279–280 (5th Cir. 2000) (citing *Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997), *cert. denied* 522 U.S. 1084 (1998)). Once the plaintiff makes his *prima facie* showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Once the employer articulates such a reason, the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination.

As described in Section IV.A., *supra*, the Court declines at this stage to determine whether Quick meets the criteria of having a "disability" within the meaning of the ADA. *See McInnis*, 207 F.3d at 280 ("[T]he threshold element of a *prima facie* showing of discrimination under the ADA is a showing that the plaintiff either is, or is regarded as being disabled. Failure to establish an actual or perceived disability is thus fatal to a plaintiff's case."). Because Quick has provided evidence that Neimeier stated that Quick's "lifting restriction . . . is not going to

work in the area that she works," *see* Dkt. No. 21 Ex. 11, she has presented more than "a scintilla of evidence" that Walmart's stated reasons for terminating her was pretextual. *See Little*, 37 F.3d at 1075. The Court accordingly declines to determine whether to grant Walmart's motion for summary judgment as to Quick's disability claim until the issue of whether Quick is disabled has been briefed.

## V. Age Discrimination Claim

Quick also alleges that Walmart discriminated against her based on her age in violation of Chapter 21 of the Texas Labor Code when it failed to provide her reasonable accommodation and terminated her. First Am. Pet. ¶¶ 8, 11.

"The relevant parts of the TCHRA are patterned after Title VII of the federal Civil Rights Act. Thus, [Texas courts] . . . ordinarily look to federal precedents for interpretative guidance to meet the legislative mandate that the TCHRA is intended to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments.' " *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 474 (Tex. 2001) (quoting Tex. Labor Code § 21.001(1)). "Section 21.051 is substantively identical to its federal equivalent in Title VII, with the exception that the federal law does not protect age and disability." *Id.* (citing 42 U.S.C § 2000e–2(a)). Federal law protects age under the Age Discrimination in Employment Act ("ADEA"). *See* 29 U.S.C. §§ 621–634 (2016).[6]

In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Supreme Court recently analyzed the ADEA's use of the phrase "because of." In considering whether the burden of persuasion ever shifts to the defendant under the ADEA, the Court reasoned that "because of" means that "age was the 'reason' that the employer decided to act," and held that a plaintiff seeking to establish a discrimination claim under the ADEA "must prove that age was the 'but-for' cause

---

[6] The ADEA provides, in relevant part, that:
　　[i]t shall be unlawful for an employer
　　(a) ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.
29 U.S.C. § 623(a)(1) (2016)

of the employer's adverse decision." *Id.* at 176. The Court also held that the plaintiff retains the burden of persuasion to establish this but-for causation "by a preponderance of the evidence (which may be direct or circumstantial)." *Id.* at 177–78; *see also Paulissen v. MEI Techs., Inc.*, 942 F. Supp. 2d 658, 663 (S.D. Tex. 2013).

Before *Gross*, the Fifth Circuit analyzed ADEA claims based on circumstantial evidence using the *McDonnell Douglas* burden-shifting framework. *See, e.g., Berquist v. Washington Mutual Bank*, 500 F.3d 344, 349 (5th Cir. 2007), *cert. denied*, 552 U.S. 1166 (2008). In *Gross*, the Supreme Court observed that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* utilized in Title VII cases is appropriate in the ADEA context." *Gross*, 557 U.S. at 175 n.2. Nevertheless, the Fifth Circuit has continued to use the *McDonnell Douglas* framework post-*Gross* when deciding ADEA claims based on circumstantial evidence. *See, e.g., Jackson v. Cal–Western Packaging Corp.*, 602 F.3d 374, 378 & n.15 (5th Cir. 2010) (stating that "[w]hile the Supreme Court has not definitively resolved whether [the *McDonnell Douglas* framework is inapplicable to ADEA claims], we are bound by our circuit precedent applying *McDonnell Douglas* to age discrimination cases").

To establish a *prima facie* case of discriminatory treatment based on age, a plaintiffs are required to prove: 1) "they are within the protected class"; 2) "they are qualified for the position"; 3) "they suffered an adverse employment decision"; and 4) "they were replaced by someone younger or treated less favorably than similarly situated younger employees (i.e., suffered from disparate treatment because of membership in the protected class)." *Leal v. McHugh*, 731 F.3d 405, 411 (5th Cir. 2013) (citing *Smith v. City of Jackson, Miss.*, 351 F.3d 183, 196 (5th Cir. 2003)). Under the statute, the protected class includes individuals who are at least forty years old. *Id.* (citing 29 U.S.C. §§ 631(a), 633a(a)). "Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.* (quoting *O'Connor v. Consol. Coin Caterers*

*Corp.*, 517 U.S. 308, 313 (1996)). In response, the defendant can assert "a legitimate nondiscriminatory reason for its employment action." *Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 753 (5th Cir. 2005) (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004)). If the defendant succeeds in articulating a nondiscriminatory reason, the plaintiff must prove by a preponderance of the evidence that the defendant would not have made its adverse employment action but for the plaintiff's age. *See* Fifth Circuit Pattern Jury Instruction 11.15 (2014) (noting that the Supreme Court in *Gross* eliminated the mixed-motive theory in an ADEA case and made clear that the but-for causation standard applies).

Quick alleges that she was discriminated against based on her age by not receiving reasonable accommodations when other, younger, male employees did. Quick's complaint also provides generally that Walmart "ignored the requests for a reasonable accommodation and in a retaliatory fashion terminated [Quick] because she was damaged goods." First Am. Pet. ¶ 8.

The Court first considers whether Quick has shown that she was subject to an adverse employment decision. The first part of Quick's complaint implies that Walmart's refusal to grant Quick other assignments outside the meat market to a more medically appropriate position—assuming for the purposes of argument that such a position existed at the time of Quick's Temporary Alternative Duty Assignment—represents an adverse employment action. Courts have frequently found that lateral transfers do not constitute an "adverse employment action" in discrimination cases brought under the ADEA, and a case arising from the Western District of Texas found that an employer's refusal to transfer a plaintiff to a light-duty assignment did not constitute an adverse employment decision because the assignment would have "constituted a purely lateral transfer." *See Silva v. Chertoff*, 512 F. Supp. 2d 792, 805 (W.D. Tex. 2007); *see also Craven v. Texas Dep't of Criminal Justice-Institutional Div.*, 151 F. Supp. 2d 757, 766 (N.D. Tex. 2001) ("Courts have also frequently found that lateral transfers do not constitute an 'adverse employment action' in discrimination cases brought under the . . . Age Discrimination in Employment Act . . . .") (citing *Williams v. Bristol–Myers Squibb*

*Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (lateral transfer insufficient to constitute adverse employment action even though it resulted in drastic reduction in commission income)). In *Craven*, the Court concluded that to avoid summary judgment on the plaintiff's failure to transfer claim, the plaintiff must show that the position sought was objectively better than her position at the time, in some non-trivial way. *See Craven*, 151 F. Supp. 2d at 768; *see also Williams*, 85 F.3d at 274 ("Obviously a *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either. Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.") (emphasis in original) (citations omitted). Quick has not met her burden to show that the denial of any requests to a more medically appropriate position was an adverse employment action within the meaning of ADEA. Like the court in *Silva v. Chertoff* explained, in fact, a transfer to a light-duty assignment would have been a mere lateral transfer. *See* 512 F. Supp. 2d at 805.

However, Quick also alleges that her termination constituted discrimination based on her age. Unlike the allegation regarding accommodation of Quick's twenty-pound lifting limitation, an action to terminate an employee qualifies as an adverse employment action as a matter of law. *Cf. Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) ("The parties do not dispute that Jackson has alleged a prima facie case of age discrimination since he was terminated, qualified, forty years or older . . . , and replaced by someone substantially younger."). Quick has also produced more than a scintilla of evidence through the deposition of Lopez that Walmart sought younger employees for the meat market. Lopez Dep., Dkt. No. 21 Ex. B, 19:18-24; 20:11-14 (testifying that Leija "pulled me over to the side and told me that I would basically have to start hiring younger people . . . because they're a lot faster, quicker [and] don't have to deal with any type of missed days or doctor's – doctor appointments or whatnot"). The Court therefore finds that Quick has created

a genuine factual issue for trial, *see Celotex*, 477 U.S. at 325, and that Walmart's motion for summary judgment on the issue of Quick's age discrimination claim should be denied.

## VI.    Sex Discrimination Claim

Quick alleges that Walmart discriminated against her based on her sex when it allegedly denied her the reasonable accommodation of restricted lifting. First Am. Pet. ¶ 8; *see also* Dkt. No. 21 at 18–19. Quick alleges the same facts as in her age discrimination claim regarding the two younger male employees given lighter duties—one when he broke his finger and the other when he was recuperating from a broken toe. *Id.*; *see also* Dkt. No. 21 at 19. In addition, Quick alleges that she was subjected to sexist comments by management, such as, "[y]ou're a woman, what do you expect" and " 'here are the dishes' and '[y]ou can do dishes, you're used to that.' " Dkt. No. 21 at 19 (citing Quick Dep., Dkt. No. 21 Ex. A at 121:7–122:25). Quick argues that these allegations are enough to raise a genuine issue of material fact as to whether Quick has made out a *prima facie* sex discrimination claim. *Id.* at 18–19 (citing *Elgaghil v. Tarrant Cty. Junior Coll.*, 45 S.W.3d 133, 138 (Tex. App. 2000), for the elements of a Chapter 21 Texas Labor Code discrimination claim).[7]

The summary judgment evidence provided by Quick that she asked for a transfer to lighter-duty stations, taken in the light most favorable to Quick, does not raise a genuine issue of material fact for the purposes of overcoming summary judgment because as a matter of law, failure to provide a requested lateral transfer does not constitute an adverse employment action. *See Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 644 (Tex. App. 2015) (stating that, generally, "adverse

---

[7] The Court notes that Quick has cited the elements to establish a *prima facie* case of employment discrimination based on the employer's failure to promote. *See* Dkt. No. 21 at 18 ("[T]o establish a prima facie case of employment discrimination based on the employer's failure to promote, a plaintiff must show that (1) he is a member of a protected class, (2) he sought and was qualified for an available employment position; (3) despite his qualifications, plaintiff was not selected for the position, and (4) the employer selected someone not in plaintiff's protected class or continued to seek applicants with the plaintiff's qualifications.") (citing *Elgaghil*, 45 S.W.3d at 138). However, Quick does not appear to be alleging sex discrimination based on failure to promote.

employment decisions" involve hiring, granting leave, discharging, promoting, and compensating employees).

Even if the Court were to construe Quick's sex discrimination claim as being brought under a hostile environment theory of sex discrimination, which she does not appear to plead, Quick's summary judgment evidence does not raise a genuine issue of material fact. To make a *prima facie* showing of hostile environment sexual harassment under Chapter 21 of the Texas Labor Code, a plaintiff must meet the following elements: (1) the employee belonged to a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take adequate remedial action. *Mayfield v. Tarrant Reg'l Water Dist.*, 467 S.W.3d 706, 712 (Tex. App. 2015) (citing *Soto v. El Paso Natural Gas Co.*, 942 S.W.2d 671, 677–78 (Tex. App. 1997)). If the harassment was by plaintiff's supervisor, some courts do not require a showing as to the fifth element. *Nairn v. Killeen I.S.D.*, 366 S.W.3d 229, 245 (Tex. App. 2012).

"For conduct to be actionable, a plaintiff must show 'the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create a hostile or abusive working environment.' " *Spring v. Walthall*, No. 04–09–00474–CV, 2010 WL 2102988, at *5 (Tex. App., May 26, 2010) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Sexual harassment is sufficiently severe or pervasive to alter the terms, conditions, or privileges of the victim's employment when it can be said to create an abusive working environment.

While the comments allegedly leveled at Quick may have been offensive, Texas courts have found that other instances of far more flagrant conduct do not rise to the level of creating a fact issue as to hostile work environment. *See, e.g.*, *Garcia v. Schwab*, 967 S.W.2d 883 (Tex. App. 1998, no pet.); *Staller v. Service Corp. Int'l*, 2006 WL 3018039, at *5–6 (Tex. App. 2006, no pet.); *Alamo Heights Indep.*

*Sch. Dist. v. Clark*, No. 04-14-00746-CV, 2015 WL 6163252, at *1 (Tex. App., Oct. 21, 2015), *review granted* (Mar. 10, 2017).

After due consideration, the Court concludes that no reasonable jury could return a verdict for Quick on her TCHRA sex discrimination claim. The Court will accordingly grant Defendant's motion for summary judgment as to this claim.

## VII.   Conclusion and Order

For the reasons set forth above, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Walmart's motion for summary judgment, Dkt. No. 20.

The Court **GRANTS** Walmart's motion as to the FMLA interference and retaliation claims and **GRANTS** Walmart's motion as to the sex discrimination claim.

The Court **DENIES** Walmart's motion as to Quick's age discrimination claim.

The Court declines to rule on Quick's disability claims and **ORDERS** supplemental briefing attaching relevant summary judgment evidence on whether Quick was disabled within the meaning of TCHRA, in accordance with the following schedule:

- Plaintiff's briefing to be submitted by July 1, 2017.

- Walmart's response to be submitted by July 22, 2017.

- Plaintiff's reply brief to be submitted by August 5, 2017.

The Court **CONTINUES** the Final Pretrial Conference currently scheduled for July 27, 2017 to a date to be determined after the submission of supplemental briefings.

SIGNED this 2nd day of June, 2017.

Hilda Tagle
Senior United States District Judge